## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **KENNETH HILL, ET AL** | **CIVIL DOCKET NO. 1:18-CV-01363** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **THE GEO GROUP, INC., ET AL** | **MAGISTRATE JUDGE JOSEPH H.L. PEREZ-MONTES** |

### <u>MEMORANDUM RULING</u>

Before the Court are two motions filed by Defendants, The GEO Group, Inc. ("GEO Group"), CPT Operating Partnership, LP, and David Cole (collectively, "Defendants"), including a MOTION TO EXCLUDE TESTIMONY BY DR. STEPHANIE CAVE [Doc. 124] (the "*Daubert* Motion") and a MOTION FOR SUMMARY JUDGMENT [Doc. 120] (collectively, "the Motions"). Plaintiffs oppose both motions. [Docs. 135, 138]. The Court held evidentiary hearings and oral argument on June 29, 2021, and again on September 24, 2021, during which it heard the testimony of Dr. Stephanie Cave. The Court took the Motions under advisement.

For the following reasons, the Court grants Defendants' *Daubert* Motion and excludes the expert opinion testimony of Plaintiffs' expert Dr. Stephanie Cave from the trial of this matter – finding that Dr. Cave's opinions do not meet the applicable standards for reliable, relevant evidence as set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and its progeny. 509 U.S. 579, 585 (1993). Furthermore, although the Court expresses its serious concerns over the manner in which GEO Group cared for the safety and health of Plaintiff employees during the relevant time period, the Court ultimately finds that without Dr. Cave's testimony twelve of the

1

thirteen plaintiffs in this matter are unable as a matter of law to establish specific causation between their alleged exposure to mold and their reported illnesses. Accordingly, summary judgment in favor of Defendants is appropriate as to the claims of these Plaintiffs.[1]  Accordingly, Defendants' Motion for Summary Judgment is granted in part and denied in part.[2]

## BACKGROUND

This matter was originally filed in the 28th Judicial District Court in LaSalle Parish in September of 2018.  [Doc. 1-2].  The Plaintiffs' claims include negligence, failure to provide a safe place of work under La. Rev. Stat. § 23:13, and premises liability stemming from alleged health effects they suffered following their exposure to certain molds located within the LaSalle Immigration and Customs Enforcement ("ICE") Processing Center, an immigration detention facility located in Jena, Louisiana (herein, the "Facility").  [Doc. 1-2, ¶ 17].  Defendants removed this matter to the Western District of Louisiana on October 18, 2018.  [Doc. 1].  Despite numerous delays, discovery in this matter is now complete and the trial date has been fixed for January 31, 2022.

The Plaintiffs in this matter are thirteen nurses who worked inside the medical unit at the Facility for various periods from 2007 to 2020.  [Docs. 1-2, 35, 37].  GEO

---

[1]     This includes Plaintiffs: Lindsey Alwell, Wylie Barham, Kimberly Fannin, Kenneth Hill, Marli Hudnall, Cherita Kelly, Theresa Mitchell, Charlene Paul, Sommer Peoples, Mylinda Riddle, Memory Shriner, and Hansen Stringer.

[2]     With respect to the remaining Plaintiff, Verna Bertrand, this Court previously found Dr. Allen Cooper qualified to testify as an expert witness as to specific causation – namely, the mold's exacerbation of Bertrand's asthma. *See* [Doc. 150] (Minutes for proceedings held before Judge David C. Joseph on June 29, 2021).

Group is the lessee and operator of the Facility by way of a lease agreement with Defendant CPT Operating Partnership, LP ("CPT").  Defendant David Cole ("Cole") is the Facility's warden.

Plaintiffs allege that during their employment with GEO Group they were required to work "12-hour shifts" in a clinic that would "frequently flood" and "leak with every rain," while "A/C condensation would drip on their heads."  [Doc. 135]. Plaintiffs contend that this long history of flooding, roof leaks, and moist and damp conditions at the Facility, combined with Defendants' purported failure to remediate the water damage, led to the long-term growth of the molds Aspergillus/Penicillium, Cladosporium, Stachybotrys, and other harmful molds within the nursing station of the Facility.  [Doc. 1-2, ¶ 16-17].  Plaintiffs claim to have submitted medical histories to their doctors prior to working at the Facility indicating "their health was reasonably good with no problems of congestion, shortness of breath, fatigue, or clarity of thought."  [Doc. 138, p. 4].  Thus, they posit that their exposure to these harmful molds led to the myriad of medical aliments now suffered by Plaintiffs: from headaches, sore throats, fatigue, and drowsiness, to renal failure, the development of a pericardial cyst, a lung nodule, and lupus.  Plaintiffs all point to their exposure to mold while working at the Facility as the source of their ailments.

Several specialists have conducted mold testing at the Facility from 2016 until 2020.  Although there is substantial evidence that the Facility's medical unit did, in fact, suffer regular episodes of water intrusion, the results of the mold testing were

decidedly mixed.[3]   However, accepting for purposes of summary judgment that Plaintiffs were in fact exposed to some level of mold at the Facility, Plaintiffs still bear the burden of establishing that their exposure to these molds caused their alleged injuries.   To meet this burden, Plaintiffs designated three expert witnesses to present testimony bearing on causation between the Plaintiffs' exposure to mold and their purported illness:  Drs. Robin A. Bernhoft, J. Allen Cooper, Jr., and Stephanie F. Cave.   Plaintiffs posit that the testimony of these doctors sufficiently establishes the causation element of their claims.   [Doc. 138].

---

[3]      The summary judgment evidence shows that Glenn Ray, a "mold investigator," conducted his first inspection of the Facility in 2016.  [Doc. 120-3, p. 9].  According to Ray, this inspection did not reveal anything that would "warrant further investigation or sampling" and it does not appear any mold readings were produced with this investigation. [*Id.*, p. 9].  In August 2018, Ray visited the Facility again, this time conducting and producing a "Moisture/Fungal Investigation Report."  [*Id.*, p. 17; Doc. 138-1, p. 1].  This report evidences the presence of Aspergillus/Penicillium, Cladosporium, and Stachybotrys taken from both swab samples on surfaces within the Facility and spore trap samples capturing spores in the indoor air.  [*Id.*, p. 24; Doc. 138-1, p. 8].  Ray's report notes that the total indoor counts are below the outdoor, and that the indoor air, while low, is being dominated by Aspergillus/Penicillium.  [*Id.*].  Ray conducted further tests in September 2018, finding again the presence of these molds.  [120-3, p. 71].

Robert Parks, a "mold and moisture investigator," also investigated the Facility, issuing a report in November 2018.  [Doc. 120-4].  Parks sent samples taken at the Facility to SGS Galson ("SGS") Laboratory, which confirm Ray's findings of some levels of molds inside the Facility and that the total counts outdoors exceed those indoors.  [*Id.*, pp. 26-33, 43-46].  Based on his investigation, Parks believes the Facility has "experienced numerous periods of moisture intrusion and intermittent water damage such that it has become a source for mold and possible bacteria growth."  [*Id.*, p. 2].  Parks also conducted investigation that identified mold in the Facility in August 2019.  [*Id.*, p. 67].

David Watts, an industrial hygienist, investigated and conducted testing at the Facility on two occasions: November 2018 and July 2019.  [Doc. 120-5].  He confirmed the presence of mold at the Facility, but concluded it is "not indicative of a mold source … that has become airborne at elevated concentrations which would be considered unusual or atypical for indoor occupied and working environments."  [*Id.*, p. 5].

The motion practice in this matter has thus far been involved.  Including the Motions *sub judice*, the Court has now considered five *Daubert* motions [Docs. 113, 114, 118, 119, and 124], a motion in limine [Doc. 108], and two motions for summary judgment [Docs. 92, 120].  The Court held two separate hearings wherein the Court resolved most of these motions on the record.  [Docs. 150, 155].  During a June 29, 2021, motions hearing, the Court granted in part and denied in part a motion to exclude the testimony of Dr. Bernhoft, finding that he was qualified to testify generally to the medical conditions attributable to mold exposure, but – in large part because he did not treat or perform differential diagnoses on the Plaintiffs – he was not qualified to testify that the Plaintiffs' exposure to mold at the Facility was the cause of their illnesses.[4]  Thus, the Court ruled that Dr. Bernhoft is qualified to testify as to general causation, but not the specific causation of the Plaintiffs' alleged illnesses.  At the same hearing, the Court denied Defendant's *Daubert* motion as to Dr. Cooper, finding that he is well-qualified to testify as to specific causation regarding the aggravation of Plaintiff Bertrand's preexisting asthma from mold exposure.[5]

The Court now turns its attention towards the Plaintiffs' final expert, Dr. Stephanie Cave, who has been designated by Plaintiffs to testify at trial that, generally, the Plaintiffs' alleged exposure to mold at the Facility is the specific cause of their medical ailments.  [Doc. 124-8].  The Court has now reviewed the expert

---

[4]   *See* [Doc. 150] (Minutes for proceedings held before Judge David C. Joseph on June 29, 2021).

[5]   *See id.*

5

report, supplemental reports, and deposition testimony of Dr. Cave; heard her testimony through the course of two proceedings on the record; and considered the scope and purported bases of her opinions.  The *Daubert* Motion pertaining to Dr. Cave is now ripe for ruling.

## DISCUSSION

### I.   Defendants' *Daubert* Motion

This is a toxic tort case in which Plaintiffs claim that they were exposed to certain harmful molds – primarily, the molds Aspergillus/Penicillium, Cladosporium, and Stachybotrys – while working in the medical unit within an ICE Processing Center, and that this exposure caused the various health ailments from which they now suffer.  [Doc. 1-2, ¶ 17].  To succeed on their claims, among other things, Plaintiffs must have competent evidence to demonstrate both: (i) general causation, *i.e.,* that there is a sufficient scientific link between human exposure to molds and the maladies that afflict the Plaintiffs; and (ii) specific causation, *i.e.,* that Plaintiffs' exposure to mold while working at the nursing station of the Facility caused their various ailments.  *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) ("General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury.").

To prove causation, Plaintiffs offer the expert testimony of Dr. Stephanie Cave, a treating physician of all Plaintiffs, who is board certified in family medicine but practices "integrative" and "functional" medicine.  [Doc. 124-8].  Dr. Cave offered her

opinion establishing specific causation between each of the Plaintiffs and their alleged exposure to mold in a report dated October 3, 2019.  [Doc. 124-8].  This report was then supplemented with several addendums.[6]  [Docs. 120-11, p. 151-52; 124-10; 124-11].  Her report and each addendum concludes that, "in [Dr. Cave's] professional judgment, the illnesses found in [Plaintiffs], more likely than not, was caused by their long term (sic) exposure to the mold and bacteria found by Ray and Parks at LaSalle ICE detention center."  [Doc. 124-8, p. 2].  She maintains that the "specific types and dose of mold or fungi count levels found … at the Facility including Aspergillus/Penicillium and Stachybotrys are capable of causing the sickness and injury reported and diagnosed for these nurses."  [*Id.*].  Furthermore, the "length of time of exposure … increased the dose and ill effects of such exposure," which was "sufficient to cause injury to their health."  [*Id.*].  She adds that her conclusion is further "supported by the fact that so many individuals who worked in the same location for more or less the same period of time, became ill."  [*Id.*].

Defendants aver that Dr. Cave's testimony is insufficient to establish either general or specific causation and should be excluded on the basis that her putative testimony fails to meet the standard of reliability under Federal Rule of Evidence 702 – *i.e.*, her reasoning and methodology is not scientifically or medically valid.  [Doc. 124-1].  Defendants point to several features of her report as unreliable, including: (i)

---

[6]     Defendants object to the timeliness of Dr. Cave's final addendum to her report [Doc. 124-11], stating that it was "submitted after the deadline for expert reports."  [Doc. 124-1]. While the supplemental opinions included in the report could be excluded under Federal Rules of Civil Procedure 26(a)(2)(B), the Court overrules Defendants' objection and considers the supplemental report for purposes of its analysis.

her inability to establish relevant mold counts; (ii) her use of "non-FDA approved" urine mycotoxin tests; and (iii) her improper methodology in forming her diagnosis of Plaintiffs. *Id.*

The Court has considered the submissions by the parties, including the pleadings, the expert reports submitted by Dr. Cave, her *curriculum vitae*, and the laboratory testing by Ray and Parks, along with the relevant case law.  For the reasons set forth herein, the Court finds that Dr. Cave's proffered testimony as to specific causation does not meet the requirements of Rule 702 and *Daubert* because she fails to articulate that her opinions are supported by scientifically valid facts and because she did not apply a diagnostic methodology that is demonstrably reliable.[7]

### a. Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

To qualify as an expert, a witness "must have such knowledge or experience in [her] field or calling as to make it appear that [her] opinion or inference will probably aid the trier in his search for truth." *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992) (citations omitted).  If the proponent establishes that an expert

---

[7]     The Court does not decide at this time whether Dr. Cave is qualified to testify as to general causation between illness and mold exposure.

witness is otherwise "qualified" under Rule 702, the trial court is charged with determining whether his testimony is reliable and relevant.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012) ("[T]he trial judge serves as a gatekeeper to ensure the reliability and relevance of expert testimony.").

Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).  The reliability analysis "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.  The proponent need not prove to the judge that the expert's testimony is correct, but he must prove by a preponderance of the evidence that the testimony is reliable. *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In *Daubert*, the Supreme Court set forth several non-exclusive factors that may be relevant to the reliability analysis, including: 1) whether the technique at issue has been tested; 2) whether the technique has been subjected to peer review and publication; 3) the potential error rate; 4) the existence and maintenance of standards controlling the technique's operation; and 5) whether the technique is generally accepted in the relevant scientific community.  *Daubert*, 509 U.S. at 593-595.  The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Generally, questions relating to the basis and sources of an expert's opinion rather than its admissibility should be left for the jury's consideration. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420d, 422 (5th Cir. 1987). However, as is the case here, this general rule "yields when 'the source upon which an expert's opinion relies is of such little weight ... that [the] testimony would not actually assist the jury in arriving at an intelligent and sound verdict.'" *Slaughter v. S. Talc Co.*, 919 F.2d 304, 306 (5th Cir. 1990) (quoting *Viterbo*, 826 F.2d at 422).

**b. Analysis**

To establish specific causation in a toxic mold case, Plaintiffs "must prove, given that the mold in question is capable of causing harm of the type suffered, that the specific type of mold found more likely than not caused [Plaintiffs] injuries in this particular case." *Hooks v. Nationwide Housing Systems*, LLC, No. 15-729, 2016 WL 3667134, at *8 (E.D. La. July 11, 2016) (citing *Watters v. Dep't of Soc. Servs.*, 08-0977 (La. App. 4 Cir. 6/17/09), 15 So. 3d 1128, 1142-43). The law does not require a showing of a precise level of exposure to hold a defendant liable, nor does it require an expert to calculate the precise level of the plaintiff's exposure to satisfy reliability. *Schindler v. Dravo Basic Materials Co., Inc.*, No. 17-13013, 2019 WL 446567, at *5 (E.D. La. Feb. 2, 2019). Rule 702 does, however, require a testifying expert to base his or her opinion on sufficient information about the circumstance or level of the alleged toxic exposure. *Id*. This requirement goes beyond a general statement that the plaintiff was exposed to some amount of a toxic substance. [*Id*.].

Dr. Cave primarily relies on two physical tests to prove specific causation: (i) the mold testing conducted by Ray and Parks establishing some presence of Aspergillus/Penicillium, Cladosporium, and Stachybotrys at the Facility; and (ii) urine testing by Great Plains Laboratory ("Great Plains") showing the presence of mycotoxins in most of the Plaintiffs.[8]  [Doc. 135, p. 4].  Her reliance on these tests, however, is misplaced and misapplied.

As mentioned above, the results from the mold testing conducted by Ray and Parks do reveal the presence of molds alleged to have caused Plaintiffs' illnesses inside the Facility.  *See* [Docs. 120-3; 120-4].  These tests, alone, are insufficient to establish specific causation.  *See McCook v. Unum Life Ins. Co. of Am.*, 63 F. Supp.2d 729, 740 (E.D. La. 2020) (finding the presence of stachybotrys chartarum "by itself … is almost meaningless").  Rather, they establish only the presence of a mold capable of producing mycotoxins.[9]  For that reason, Dr. Cave uses these tests to establish a baseline possibility of exposure to mycotoxins and uses the urine tests to establish actual exposure to mycotoxins.  *McCook*, 63 F. Supp.2d at 740.

Turning to the urine mycotoxin tests, Dr. Cave states in her deposition that she administered "urine testing for mold toxin" on many of the Plaintiffs and relied upon their results as part of her evaluation process.  [Doc. 124-7, p. 9].  The results appear to show the presence of various mycotoxins associated with the molds found

---

[8]     Dr. Cave conceded in her deposition that she did not conduct the urine mycotoxin testing on all thirteen plaintiffs.  [Doc. 124-1, p. 133].

[9]     Mycotoxins are the metabolites of some fungi that can cause illness in humans.  *See* [Doc. 124-2].

during the tests at the Facility, including Ochratoxin (Aspergillus), Mycophenolic Acid (Penicillium), and Verrucarin A (Stachybotrys).   [Doc. 124-14].   Other mycotoxins, such as those associated with Fusarium – which was not found at the Facility – also appear on these tests.   [*Id.*].   Defendants do not dispute that these tests revealed mycotoxins in Plaintiffs' urine.   Rather, Defendants discount the reliability of these tests in diagnosing illness in humans, noting that they are not approved by the FDA for accuracy or clinical use.   [Doc. 124-1, p. 21].

The Court has significant doubts as to the diagnostic value, if any, of the urine mycotoxin tests as well at the reliability of how they were employed by Dr. Cave in reaching her opinion as to causation.   When expert testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question, 'the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

Notwithstanding Plaintiffs' assertion that these tests are "CLIA" certified, the absence of FDA approval has been viewed by other courts in this Circuit as sufficient reason to question a practice.   *See, e.g., McCook*, 63 F. Supp.2d at 740.   More to that point, Plaintiffs have not provided the Court with any explanation outlining the procedures utilized by Great Plains in performing the urine mycotoxin tests beyond mere "conclusions and assurances of reliability."[10]   *See* Fed. R. Evid. 702 advisory

---

[10]     Plaintiffs failed to cite any other case that approved of the use of Great Plains' urine mycotoxin tests to support causation.   Urine mycotoxin tests from other laboratories, such as Real Time Labs, have been viewed unfavorably.   *McCook*, 63 F. Supp.2d at 740.

committee's notes (2000 amendments) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1994) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it."). Courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony." *Knight*, 482 F.3d at 355. Upon Defendants' questioning of this type of testing, Plaintiffs had the opportunity to produce materials outlining Great Plains' procedures in performing these tests, peer reviewed studies analyzing these tests, and evidence of other medical professionals relying on these tests to make their own diagnoses – assuming such evidence exists. Instead, Plaintiffs have merely offered conclusory statements to convince the Court that such tests are "tried and true, regular medical tests."[11] [Doc. 135, p. 8]. Plaintiffs' failure to provide the Court with scientific support for the reliability of these tests in diagnosing illness weighs significantly against their probative value. *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 309–10 (5th Cir. 1989) ("[C]ourts must critically evaluate the reasoning process by which experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them.").

The Court also questions whether Dr. Cave reliably applied the urinalyses to the facts in this matter. She admitted in her deposition that she had not conducted the test on at least one Plaintiff at the time she made her diagnosis. [Doc. 124-7, p.133-34]. She also conceded before the Court that she wrote several of the letters

---

[11]      Dr. Cave also testified that she believes the urine tests are reliable because after she treats a patient and the patient gets better, the fact that their status improves confirms that the testing is accurate. [Doc. 135-2, p. 27]

submitted with her report evidencing the diagnosis of each Plaintiff before receiving the results of the urine mycotoxin tests.[12]  However, the Court finds that this is but a symptom of a larger problem with Dr. Cave's methodology in rendering her opinions in this matter.

Beyond the urine mycotoxin tests, Dr. Cave's opinions that the Plaintiffs' injuries were caused by mold exposure are supported by extremely limited evidence. In essence, Dr. Cave bases her opinion almost exclusively on the urine testing discussed above, the fact that each of the Plaintiffs worked in the medical unit of the Facility, and Dr. Cave's review of some pictures provided to her by counsel showing significant water intrusion into the Facility's medical unit.  [Docs. 124-7, p. 247, 150, 155].

Indeed, when the Court scratched the surface of Dr. Cave's diagnostic opinions, it was unable to find facts or methodology underlying her opinions.  As mentioned above, Dr. Cave opined in her report, "The specific types and dose of mold or fungi count levels found … at the Facility including Aspergillus/Penicillium and Stachybotrys are capable of causing the sickness and injury reported and diagnosed for these nurses."  [Docs. 124-8, p. 2, 138, p. 5].  However, when asked in her deposition about the specific levels of mold required to cause health problems, she did not identify any, stating instead that "it depends on the patient" and on "the patient's ability to detox" the mold.  [Docs. 124-7, p. 37-38].  When pressed about the doses of

---

[12]     See [Doc. 150] (Minutes for proceedings held before Judge David C. Joseph on June 29, 2021).

mycotoxins believed to be toxic to humans, Dr. Cave's answer was again unclear, testifying "We don't have a dose that's toxic.  If you look at the patients, everyone's different, and their tolerances are different."  [Doc. 124-7, p. 7].  When asked if the dosage of an alleged toxin is in any way relevant to her analysis, she responded, "It's not going to tell me whether or not it's a problem for the patient, no."  [Doc. 124-7, p. 8].

Yet, Dr. Cave reasons that because each Plaintiff asserts that their symptoms only began after they started working at the Facility, that each one of the Plaintiffs' symptoms are, more likely than not, caused by the mold at the Facility.  [Doc. 124-8].  When questioned about what supported this conclusion regarding specific conditions of the Plaintiffs, Dr. Cave was unable to sufficiently attribute mold exposure as the underlying cause.  When discussing Plaintiff Cherita Kelly's lupus diagnosis, Dr. Cave testified "I don't think we really know what causes Lupus."  [Doc. 124-7, p. 117].  When asked about whether mold exposure can cause pericardial cysts like the one found in Plaintiff Memory Shriner, she testified "I don't think we can say one way or the other on that one."  [Doc. 124-7, p. 139].  Dr. Cave could not definitively attribute Plaintiff Hansen Stringer's lung nodule with mold exposure either, saying "I can't say for sure that that was the only cause [of the lung nodule]."  [Doc. 124-7, p. 81].  Nevertheless, Dr. Cave concluded that the lupus diagnosis, the presence of the pericardial cyst, and the lung nodule were more likely than not caused by mold exposure at the Facility.  *See* [Doc. 124-8, p. 2].  Her conclusions are not based on sufficient information about the circumstance or level of Plaintiffs' exposure

15

attributable to the Facility beyond general, conclusory statements that the plaintiff was exposed to some amount of a toxic substance. *See Schindler*, 2019 WL 446567, at *5. Put simply, the causal gap between the data and the opinion proffered by Dr. Cave is too large to survive the limitations of Rule 702. Thus, the lack of a recognizable methodology in Dr. Cave's diagnoses serves as an independent and equally compelling reason that her testimony must be excluded.[13]

Ultimately, the Court finds Dr. Cave's testimony falls short of the standard of reliability required by Rule 702. Dr. Cave's expected testimony that Plaintiffs' reported health effects were likely caused by mold is not supported by a sufficiently reliable scientific or medical basis. Dr. Cave fails to adequately articulate the basis for her diagnostic opinion as to Plaintiffs' wide variety of ailments beyond the urine mycotoxin tests and the fact Plaintiffs all worked in the same "wet building." While the Court is mindful of its "gatekeeper" role and the deference accorded to the jury's role as arbiter of disputes between conflicting opinions, the Court's significant doubts as to the validity and reliability of Dr. Cave's opinions dictate that her testimony must be excluded in this instance. *See Moore*, 151 F.3d at 279 (finding when expert testimony is speculative and lacking in scientific validity, trial courts are encouraged to exclude it). Accordingly, Dr. Cave is precluded from offering any expert opinion testimony at trial relating to the specific causation of Plaintiffs' illnesses.

---

[13]     Dr. Cave's reliance on cited medical literature likewise fails to establish specific causation. During her deposition, Dr. Cave testified that her causation opinion is "guided by" Dr. Janette Hope. [Doc. 124-7, p. 54]. The parties have included several articles authored by Dr. Hope in their briefing. *See* [Docs. 124-12; 124-13]. However, these articles, at best, address general causation, not the specific causation that is the subject of the Court's analysis.

## II.   <u>**Defendants' Motion for Summary Judgment**</u>

The Court now turns to the second motion pending in this matter, Defendants' Motion for Summary Judgment. [Doc. 120].  Defendants aver that Plaintiffs cannot establish specific causation and thus, summary judgment is warranted.  [Doc. 120-1]. Plaintiffs counter that the evidence provided by their experts sufficiently establishes causation and that several material issues of fact preclude summary judgment.  [Doc 138].  The Court has now reviewed the summary judgment evidence and heard arguments of counsel.

The Court notes that through the course of discovery the Plaintiffs have developed compelling evidence that GEO Group failed in its duty to properly care for its employees working in the Facility's medical unit.  In this regard, there is evidence that there were consistent water leaks in the Facility, resulting in water leaking down upon the heads of the nurses while they were working.  Beyond that, there is evidence that the Plaintiffs were required on occasion to work with standing water covering the floor of the medical unit.  There is also substantial evidence that the Plaintiffs developed significant health problems while employed by GEO Group and working in these conditions.  In all, the summary judgment evidence points to the fact that GEO Group failed to treat its employees with the respect and human dignity they were due.

Despite GEO Group's apparent moral failings, the Court finds that twelve of the thirteen Plaintiffs have not established as a matter of law the specific causation between their illnesses and their alleged mold exposure at the Facility.  Accordingly,

summary judgment for Defendants is warranted as to all claims of twelve of the thirteen plaintiffs.[14]

### a. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the non-movant.  *Houston v. Texas Dep't. of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (citing *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

If the dispositive issue is one on which the nonmovant will bear the burden of proof at trial, the movant may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmovant's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmovant, who

---

[14]   These twelve plaintiffs are: Lindsey Alwell, Wylie Barham, Kimberly Fannin, Kenneth Hill, Marli Hudnall, Cherita Kelly, Theresa Mitchell, Charlene Paul, Sommer Peoples, Mylinda Riddle, Memory Shriner, and Hansen Stringer.

With respect to the remaining Plaintiff, Verna Bertrand, the Court denies Defendants' motion for summary judgment.

must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id*. at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

### b. Analysis

Louisiana's duty-risk analysis governs claims brought for toxic mold exposure. *Hooks*, 2016 WL 3667134, at *8 (citing *Pratt v. Landing at Barksdale,* No. 09-1734, 2013 WL 5376021, at *2 (W.D. La. Sept. 24, 2013)). The duty-risk analysis requires that a plaintiff prove five distinct elements: 1) the defendant had a duty to conform his ... conduct to a specific standard of care; 2) the defendant failed to conform his ... conduct to the appropriate standard of care; 3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; 4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and 5) actual damages. *S.J. v. Lafayette Parish Sch. Bd*., 2009–2195 (La.7/6/10), 41 So.3d 1119, 1125.

Other courts in this Circuit have characterized causation in a toxic mold case as the Plaintiff's "Achilles' heel." *Hooks*, 2016 WL 3667134, at *13 (quoting *Watters,* 15 So.3d at 1142); *Pratt*, 2013 WL 5376021, at *3. This is because plaintiffs in a toxic mold personal injury case must establish causation on five different levels: 1) the

presence of mold, 2) the cause of the mold and the relationship of that cause to a specific defendant, 3) actual exposure to the mold, 4) the exposure was a dose sufficient to cause health effects (*i.e.*, "general causation"), and 5) a sufficient causative link between the alleged health problems and the specific type of mold found (*i.e.*, "specific causation"). *Id.* (emphasis added).

Further, Plaintiffs must rely on expert testimony to prove causation at trial. *Pratt*, 2013 WL 5376021, at *3 (citing *Seaman v. Seacor Marine LLC*, 564 F.Supp.2d 598, 600 (E.D. La. 2008)). "In the absence of an established scientific connection between exposure and illness, or compelling circumstances ..., the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation." *Moore*, 151 F.3d at 278. The only experts for Plaintiffs who have put forth a specific causation opinion are Drs. Bernhoft, Cave, and Cooper. Because the Court has excluded the testimony of Drs. Bernhoft[15] and Cave as to specific causation of Plaintiffs' illnesses and Dr. Cooper's testimony is limited to Plaintiff Bertrand[16], the remaining Plaintiffs cannot prove the specific causation element of their toxic tort claims at trial. Accordingly, summary judgment for Defendants is proper as to all claims of Plaintiffs Lindsey Alwell, Wylie Barham, Kimberly Fannin, Kenneth Hill, Marli Hudnall, Cherita Kelly, Theresa

---

[15]   *See* [Doc. 150] (Minutes for proceedings held before Judge David C. Joseph on June 29, 2021).

[16]   *See id.*

Mitchell, Charlene Paul, Sommer Peoples, Mylinda Riddle, Memory Shriner, and Hansen Stringer.

**CONCLUSION**

For the above-mentioned reasons,

IT IS HEREBY ORDERED that Defendants' MOTION TO EXCLUDE TESTIMONY BY DR. STEPHANIE CAVE [Doc. 124] is **GRANTED**.  Dr. Cave may not testify as an expert witness as to specific causation in this case.

IT IS FURTHER ORDERED that Defendants' MOTION FOR SUMMARY JUDGMENT [Doc. 120] is **GRANTED IN PART** and **DENIED IN PART.  Summary judgment is granted and the claims of Lindsey Alwell, Wylie Barham, Kimberly Fannin, Kenneth Hill, Marli Hudnall, Cherita Kelly, Theresa Mitchell, Charlene Paul, Sommer Peoples, Mylinda Riddle, Memory Shriner, and Hansen Stringer are DISMISSED WITH PREJUDICE.  Summary judgment is DENIED as to the claims of Verna Bertrand.**

THUS, DONE AND SIGNED in Chambers on this 21st day of December 2021.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE